UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GIBSON FOUNDATION, INC., | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *   Civil Action No. 1:20-cv-10682-IT |
| | * |
| ROB NORRIS, d/b/a The Piano Mill, | * |
| | * |
| Defendant. | * |

MEMORANDUM & ORDER

May 25, 2022

TALWANI, D.J.

In its Amended Complaint [Doc. No. 61], Plaintiff Gibson Foundation, Inc. ("Foundation") brings claims against Defendant Rob Norris, doing business as the Piano Mill, for (1) breach of contract, (2) breach of bailment, and (3) conversion. In his counterclaim, Norris brings claims for (1) declaratory judgment, (2) equitable relief and (3) abuse of process. All these claims arise from a dispute over the ownership of a piano. Foundation asserts that the piano was loaned to Norris, while Norris counters that he was told he could have the piano outright if he successfully moved it from New York. Now before the court are the parties' cross-motions for summary judgment. Mots. for Summ. J. [Doc. Nos. 99, 101]. For the following reasons, Norris's motion is GRANTED, and Foundation's motion is GRANTED IN PART and DENIED IN PART.

**I.      Factual Background**

Having reviewed the parties' statements of undisputed facts, exhibits, and objections, the court summarizes the facts as follows, noting the areas of dispute.

A.   *The Subject Piano*

Baldwin Piano & Organ Company ("Baldwin") is an American piano brand. Gueikian Aff. ¶ 5 [Doc. No. 101-13]. In the 1980s, Baldwin custom made two model SD-10 concert grand pianos for Liberace, an American pianist, singer, and actor. Piano Appraisal 2 [Doc. No. 99-4]. One of the two pianos—the subject of this dispute—has the serial number 255848. Id.

B.   *Foundation's Claim of Ownership of the Subject Piano*

In 2001, Baldwin filed for bankruptcy. Asset Purchase Agreement 2 [Doc. No. 101-15]. As part of the bankruptcy proceedings, General Electric Capital Corp. ("GE") and Baldwin effected an asset purchase agreement in which GE agreed to purchase "substantially all" of Baldwin's assets. Id. The asset purchase agreement contemplated the sale of Baldwin's "personal property" but also specified that certain categories of personal property, including personal property located in Greenwood, Mississippi, would be excluded from the sale. Id. at 2-3. The agreement did not identify whether any pianos were included among the personal property being sold to GE. See id. In November 2001, GE assigned its rights, title, and interest in the asset purchase agreement to Gibson Piano Ventures, Inc. ("Gibson Piano Ventures"), Assignment 2 [Doc. No. 101-16], and designated Gibson Piano Ventures as the buyer of Baldwin and its assets, Bill of Sale [Doc. No. 101-17].

Cesar Gueikian is the President of Gibson Brands, Inc. ("Gibson"). Gueikian Aff. ¶ 3 [Doc. No. 101-13]. Gueikian believes that Gibson acquired the piano through the 2001 purchase of "Baldwin and all of the assets," but he is unaware of the existence or location of any inventory documents that show the subject piano coming into Gibson's possession. Gueikian Depo. 45 [Doc. No. 101-12]. The record contains no evidence explaining the relationship between Gibson and Gibson Piano Ventures. Baldwin has been a subsidiary of Gibson since 2001. Gueikian Aff. ¶ 5 [Doc. No. 101-13].

Foundation is also a subsidiary of Gibson. Id. at ¶ 4. On November 19, 2019, Gibson reportedly donated the subject piano to Foundation. Nov. 19, 2019 Letter [Doc. No. 101-11].

      C.     *Norris's Possession of the Subject Piano*

On June 20, 2011, Baldwin's business development manager, Tom Dorn, emailed several people including Norris about the immediate availability of two, new model BD275/BH275 concert grand pianos from Baldwin Dongbei. Gueikian Aff. ¶ 17 [Doc. No. 101-13]; Emails 12 [Doc. No. 101-14]. Norris responded that the "Piano Mill would still very much like to have a Baldwin concert grand to use for symphony rentals and promotional opportunities" but that he was "not currently in a position to shell out the 30k to purchase one outright." Emails 13 [Doc. No. 101-14]. He then mentioned that his business partner was connected to several international touring acts, such as Bob Segar, and wondered whether Dorn might be able to come up with a "creative arrangement" to help both the Piano Mill and Baldwin gain exposure. Id. Dorn responded that such an arrangement was "beyond [his] scope" but that he would forward Norris's email to someone in Gibson's entertainment relations department. Id. Norris thanked Dorn and added as "just another thought" that the Piano Mill had a full service restoration shop, and that "[i]f there was a road worn concert grand in Baldwin[']s stable," Norris would be able to do any restoration required "to get it to concert level play and back on the road." Id.

According to Norris, at some point after his email exchange with Dorn, Dorn called and said that Gibson had a Baldwin model SD-10 that Norris might be interested in and gave him the number for Jim Felber, an employee in Gibson's entertainment relations department. Emails 3, 13 [Doc. No. 101-14]; Norris Depo. 25 [Doc. No. 99-3]. Norris and Felber then had several phone calls, during which Felber told him that the subject piano was on the seventh floor of the Manhattan Center in the Hammerstein ballroom, which was being renovated. Norris Depo. 27 [Doc. No. 99-3]; Pl's Req. for Admissions Resp. No. 20 [Doc. No. 99-2]. Norris claims that

3

Felber told him that the piano would be "all yours" if Norris could remove it by the end of the week. Norris Depo. 26 [Doc. No. 99-3].[1]

On July 11, 2011, Norris's contractors moved the subject piano from the Hammerstein ballroom to his restoration shop in Hampton, Massachusetts. Id. at 27-28; Emails 14 [Doc. No. 99-5]. The summary judgment record contains no evidence of any written agreement between Gibson (or any related party) and Norris regarding either a sale of the subject piano or a bailment.

        D.      *Communications and Events Between 2011 and 2014*

Three days after moving the subject piano, Norris emailed Dorn and Felber to let them know that the piano had been safely moved and thanking them for "this opportunity." Emails 15 [Doc. No. 99-5]. Norris told them that the Piano Mill wanted to use the subject piano "in conjunction with promotional Baldwin sales, as well as occasionally renting it out to name acts," and that he would keep Dorn and Felber "apprised of any such happenings." Id. Norris also informed them that the piano had "seen some road wear" and asked whether it would be "okay to make some cosmetic repairs as well as to do some fine regulation to the action." Id. Felber responded that he was "OK with repairs and aware of missing pieces." Id. at 25.

---

[1] Foundation disputes that Felber told Norris he could have the piano, pointing to an email exchange between Felber and Dorn in which Felber suggested that they offer the piano to Norris on a long-term loan. Neither Dorn nor Felber, however, would be available as a witness at trial. See Pl's Updated Supp. Initial Disclosures ¶ 3 [Doc. No. 99-10] (stating as to Dorn and Felber that Foundation and its counsel "are unaware of the whereabouts of this individual at this time"). The emails are not admissible to prove Norris's knowledge of Dorn and Felber's proposal where there is no evidence that these communications were passed on to Norris or even that Norris was aware of them. In any event, the emails do not rebut Norris's testimony regarding what Felber said to Norris.

In 2013, the subject piano was the topic of a local news story entitled "Liberace's rhinestone piano resides in Rockland, [Massachusetts]." Letter & Exhibits 7-9 [Doc. No. 101-6]. The article stated that the subject piano had been temporarily installed in the lobby of the Time Warner Center to promote "Behind the Candelabra," a Steven Soderbergh biopic about Liberace. Id. at 8. Norris states that he, not Gibson, orchestrated the loan of the subject piano to the Time Warner Center. Norris Depo. 34 [Doc. No. 104-15].[2]

The article also quotes Norris as saying that he is the subject piano's "indefinite custodian." Letter & Exhibits 8 [Doc. No. 101-6]. Foundation asserts that this is an admission that Norris did not own the piano. Id. at 2. Norris claims that this was a reference to his mortality and that he always states that the "true owners" of a piano are "its fans." Norris Depo. 54 [Doc. No. 101-2]; Norris Decl. [Doc No. 104-14].

Throughout this period, the subject piano remained in Norris's possession, and no request was made by Gibson or anyone else for its return. Pl's Interrogatory Resp. Nos. 24-25 [Doc. No. 99-2].

    E.    *Piano Mill Showroom Roof Collapse and Gibson's Request for Return of the Subject Piano*

On February 10, 2015, the roof of the Piano Mill's Rockland store collapsed, and the disaster drew significant media attention. Emails 7 [Doc. No. 101-14]. In the aftermath, Norris

---

[2] Foundation claims that Gibson loaned the subject piano to Mr. Showmanship Productions, LLC, between July 25, 2012, and September 7, 2012, pursuant to a "loaner agreement" for use in Soderbergh's film. Pl's Statement of Undisputed Material Facts ("Pl's SOF") ¶ 8 [Doc. No. 102]. However, the loaner agreement is for a piano with the serial number 213449 2259, which is not the subject piano's serial number. Loaner Agreement [Doc. No. 101-19]. The article explained that the movie's "[p]roducers had wanted to use the [subject piano] during filming in Las Vegas, but the cost to ship it . . . was considered too high. Instead, Soderbergh used Liberace's *other* concert grand piano adorned with rhinestones, the one that was on display at the Liberace Museum in Las Vegas." Id. (emphasis original).

told the Associated Press that the subject piano was valued at $500,000, and this estimate was subsequently repeated across media outlets. Id.

The next day, Dorn emailed Norris to say that he was sorry to hear about the collapse and asking Norris to give him a call. Id. at 9. Dorn explained that he was getting a lot of questions about the subject piano "because . . . [he] just learned Monday evening that Gibson wanted to move the piano back to [New York] because they have upcoming promotions on Broadway." Id. Norris replied that the subject piano was "unscathed," and Dorn thanked Norris for "all [he] ha[d] done to take care of [it]" and informed Norris that "Gibson [would] want to move it quickly" and that Dorn would get back to him with details as soon as possible. Id. at 8.

On February 12, 2015, Norris emailed Dorn, telling him that the building had been declared a total loss and needed to be completely leveled and that there was approximately $800,000 to $1,000,000 in inventory still inside. Id. He then "propose[d] an idea—Would the folks at Gibson be willing to have the [subject piano] auctioned off with the proceeds donated to Piano Mill[']s reconstruction and restoration of all the other pianos[?]" Id. at 8. Norris noted that there would "probably never be a better time for this considering all the national press" and that "it sure would be great press for Gibson." Id. Dorn said that he would mention Norris's idea to Gibson's entertainment relations division but that he strongly suspected they would not be willing to auction off the piano, since "it is an asset that is valued at approximately $500K that is irreplaceable." Id. Dorn also asked whether, when Norris originally picked up the piano, Felber had had him sign a loan agreement because the Gibson office in Nashville was asking about it, and Felber had left Gibson the year prior. Id. Norris responded that "nothing was ever signed. [Felber] literally just said if you can come to the Ham[m]erstein and get it out it's all yours. No paperwork." Id. Norris added that he was the one who had provided the $500,000 estimated

6

value and that he had documentation valuing the subject piano at $200,000 when it was first made. Id.

On March 13, 2015, Norris emailed Dorn that the subject piano could not be "loaned out at this time" and that "[d]ue to the recent catastrophic events that took place at Piano Mill, there [was] a big fundraising concert event being planned with [the subject piano] being center stage." Id. at 11. Dorn responded that it was "not so much a matter of the [subject piano] being loaned out, as Gibson planning their own events using their own piano." Id. at 10. He stated that Gibson had planned a piano mover to come to the store the next week to pick up the piano. Id. Norris responded on March 17, 2015, that after reading Dorn's email "it seem[ed] apparent that [they] disagree[d] on the ownership of the [subject] piano." Id. Norris explained that when Felber had contacted him five years prior, "he specifically said that the piano was all [Norris's] if [he] could get it out of the [Hammerstein] ballroom." Id. Norris stated that he "wouldn't have invested the time and expense in moving and restoring the piano, not to mention insuring it, if [he] were not taking ownership." Id. Dorn answered that he had email correspondence from Felber in June of 2011 that "specifically referr[ed] to placing the piano with [Norris] on a 'long-term loan' in consideration for [Norris's] cartage and storage of the piano" and that "[t]he value of having this piano—on loan—on display in [Norris's] store was the agreed compensation for [his] expense." Id.[3]

On June 8, 2015, Gibson's general counsel emailed the Piano Mill, stating that it was "very clear" that Norris's possession of the piano came about as a "Loaner/Storage arrangement"

---

[3] The only emails in the record that can be squared with this assertion are the emails between Dorn and Ferber (and not Norris) as discussed above. Dorn ceased working for Baldwin sometime in 2015. Gueikian Aff. ¶ 17 [Doc. No. 101-13].

and that "historical contemporaneous email communications from [Norris] acknowledged the same." Jun. 8, 2015 Email [Doc. No. 99-6]. The Piano Mill's counsel responded by letter dated June 26, 2015, stating that the Piano Mill had (1) "rescued the [subject piano] from destruction based on promises that it would own the rescued piano"; (2) "cared for and insured the piano (again, at its own expense) for many years"; and (3) loaned the piano to others, including Gibson, only when the borrower acknowledged that the piano was on display courtesy of the Piano Mill and promised to return the piano. Jun. 26, 2015 Letter [Doc. No. 99-7]. The letter also noted that, in all the years that the Piano Mill had openly loaned out the subject piano, Gibson had never made a claim of ownership until the news report of the Piano Mill's roof collapse "trumpeted the potential dollar value of the piano." Id. Finally, the letter stated that Gibson had not produced any evidence of its superior right to the piano, in contrast to the Piano Mill "clear" indicia of ownership. Id. Given the Piano Mill's "long-term relationship with Baldwin," however, the Piano Mill would consider an "amicable resolution" of the dispute. Id. There is no evidence in the record of any further communications between Gibson and the Piano Mill for the next four years.

    F.    *Demand Letters and Gibson's Donation of the Subject Piano to Foundation*

On March 22, 2019, Gibson's counsel sent a demand letter to Norris with the subject "Baldwin BD275 HPE 9 (Liberace Piano)." Mar. 22, 2019 Letter [Doc. No. 101-5]. The letter demanded that Norris immediately return the piano in his possession—which counsel incorrectly identified as a Baldwin BD275 HPE 9 piano—insisting that Gibson was the rightful owner, that emails from 2015 demonstrated that Norris wanted but could not purchase a model BD275, and that Norris and Gibson had entered into a contractual bailment agreement. Id. Gibson and Norris's counsel exchanged several additional letters between April and August 2019. See Apr.

8

29, 2019 Letter [Doc. No. 101-6]; May 19, 2019 Letter [Doc. No. 101-7]; Aug. 8, 2019 Letter [Doc. No. 101-8]; Aug. 24, 2019 Letter [Doc. No. 101-9].

On October 9, 2019, Gibson's counsel sent Norris's counsel a letter, which stated that Gibson "had decided to donate the Baldwin BD275 HPE 9 that had been in [Norris's] care to Foundation . . . for a special charity auction to raise money for the Foundation's programs." Oct. 9, 2019 Letter [Doc. No. 101-10]. The letter conveyed Foundation's offer to Norris of five percent of the proceeds of the sale of the piano in exchange for his cooperation in promptly returning the piano. Id.

On November 11, 2019, Gibson and Foundation executed a bill of sale, which purported to transfer ownership of a "Baldwin Liberace SD-10" to Foundation. Bill of Sale [Doc. No. 101-18]. The bill of sale does not include a serial number specifying the piano being transferred.

On November 19, 2019, Gibson's counsel, now representing Foundation but "[c]ontinuing on Gibson's . . . correspondence," sent Norris a letter informing him that Foundation "was pleased to report that Gibson [had] donated the Baldwin BD275 HPE 9" to Foundation and that "as promised by Gibson," Foundation would give Norris five percent of the proceeds from the sale of the piano if he promptly returned it to Foundation. Nov. 19, 2019 Letter [Doc. No. 101-11].

II.     **Procedural Background**

Foundation initiated this lawsuit against Norris on December 16, 2019, in the Middle District of Tennessee. Compl. [Doc. No. 1]. Norris specially appeared and moved to dismiss for lack of personal jurisdiction and improper venue. Mot. [Doc. No. 9]. The District Judge concluded that it lacked personal jurisdiction and that venue was improper, Mem. & Order [Doc. No. 28], and transferred the case to this district, Order [Doc. No. 29].

Foundation filed an Amended Complaint [Doc. No. 61] on September 23, 2020, and Norris thereafter filed his Answer and Counterclaim [Doc. No. 64]. The parties filed the pending Cross-Motions for Summary Judgment [Doc. No. 99, 101] on January 28, 2022. Norris's motion seeks summary judgment on Foundation's claims, while Foundation's motion seeks summary judgment as to both its claims and Norris's counterclaims.

### III.  Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. Id. at 331.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Id. at 314. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of [the] pleadings." Anderson, 477 U.S. at 256. Rather, the non-moving party must "go beyond the pleadings and by

[his or] her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

The fact that the parties have filed cross motions does not alter these general standards; rather the court reviews each party's motion independently, viewing the facts and drawing inferences as required by the applicable standard, and determines, for each side, the appropriate ruling. See Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996) (noting that cross-motions for summary judgment do not "alter the basic Rule 56 standard" but rather require the court "to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed").

## IV.     Discussion

### A.     *Foundation's Claims*

Each side seeks summary judgment as to Foundations' claims for conversion, breach of bailment, and breach of contract.

1. Conversion and Breach of Bailment

Foundation's claim of conversion against Norris is based on his failure to return the subject piano. Norris counters that the claim is barred by Massachusetts' three-year statute of limitations for tort actions, Mass. Gen. Laws ch. 260, § 2A, where Foundation (1) did not bring this action within three years of Gibson's demand for the return of the piano and (2) cannot establish an ownership interest at the time of the alleged conversion.

Under Massachusetts law, a plaintiff asserting a conversion claim must show that

> (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused.

Evergreen Marine Corp. v. Six Consignments of Frozen Scallops, 4 F.3d 90, 95 (1st Cir. 1993).

On June 8, 2015, Gibson's general counsel emailed Norris demanding return of the subject piano and informing him that failure to do so would result in immediate legal action. Jun. 8, 2015 Email [Doc. No. 99-6]. On June 26, 2015, Norris's counsel responded that he did not agree that Gibson had a right to the piano. Jun. 26, 2015 Letter [Doc. No. 99-7]. Foundation's counsel understood this to be a refusal to return the piano. Pl's Req. for Admissions Resp. No. 26 [Doc. No. 99-2].

In his Motion for Summary Judgment [Doc. No. 99], Norris made a typographical error and wrote that his refusal to return the subject piano was "clarified beyond doubt on June 26, 2017," when his counsel sent Gibson the aforementioned letter. Seizing on that mistake, Foundation argues that it commenced its action within three years of June 26, 2017, and that its claim is therefore within the statute of limitations. A typo in Norris's motion does not change the accrual date of Foundation's claim, however, and that argument is rejected as frivolous.

Foundation argues further that although *Gibson* may have had notice of a cause of action in June 2015, *Foundation*, a separate entity, did not have a cause of action until after Norris refused to return the subject piano in response to its November 19, 2019 letter. But to the extent that Foundation has any possessory claim to the piano, that right is derivative of Gibson's rights. And to the extent that Gibson has failed to bring a timely claim, the statute does not start to run anew because of the transfer. Alternatively, if Foundation's possessory right is independent of Gibson's rights, Foundation has no claim at all, for "at the time of the alleged conversion" in 2015, Foundation had neither ownership nor possessory interest.

Foundation's claim for breach of bailment is similarly time-barred. Under Massachusetts law, "claims arising from the breach of a bailment have been brought as conversion or replevin actions." Aimtek, Inc. v. Norton Co., 69 Mass. App. Ct. 660, 663, 870 N.E.2d 1114 (2007) (collecting cases); see also Atlantic Fin. Corp. v. Galvam, 311 Mass. 49, 50, 39 N.E.2d 951 (1942) ("A bailor entitled to possession may maintain an action for conversion"); Warren v. Ball, 341 Mass. 350, 352-53, 170 N.E.2d 341 (1960) (action for replevin brought to recover bailed goods still held by bailee). The statute of limitations for both conversion and replevin actions is three years. Mass. Gen. Laws ch. 260, § 2A.

Accordingly, the court grants Norris summary judgment on Foundation's conversion and breach of bailment claims.[4]

    2.    Breach of Contract

Foundation also brings a claim for breach of contract. Foundation asserts that in return for loaning the piano to Norris for the purpose of warehousing and promoting it, Norris agreed to

---

[4] To the extent that Foundation brings the breach of bailment claim as a "warehousing" contract claim, the court addresses breach of contract in the next section.

pick the piano up from its New York location, perform any needed repairs, and house the piano. Norris argues that Foundation cannot establish the existence of a "warehousing agreement" and that if such an agreement existed, the essential terms are not sufficiently definite.

"Under Massachusetts law, in order to create an enforceable contract, there must be 'agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement.'" In re LP & D, Inc., 622 B.R. 473, 483 (D. Mass. 2020) (quoting Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878, 724 N.E.2d 699 (2000)). "To prove a breach of contract under Massachusetts law, a plaintiff must show that there was a valid contract, that the defendant breached its duties under the contractual agreement, and that the breach caused the plaintiff damage." Shaulis v. Nordstrom Inc., 120 F. Supp. 3d 40, 54 (D. Mass. 2015) (citation omitted).

The thrust of Foundation's argument in support of its breach of contract claim is that (1) in June 2011, Norris admitted that he could not purchase a Baldwin piano, (2) Gibson therefore offered Norris a long-term loan of the subject piano, and (3) Norris breached the terms of the contract by refusing to return the piano upon Gibson's, and then Foundation's, request. But Foundation has not offered sufficient evidence from which a jury could find an agreement on the material terms of such a contract.

First, Foundation either misunderstands or misrepresents the June 2011 emails with Norris. The original June 20, 2011 email from Baldwin referred to model BD275/BH275 concert grand pianos. In response, Norris responded that he could not afford such a piano but wondered whether Gibson might be able to come up with a "creative arrangement" that would allow him to use one for symphony rentals and promotional opportunities. Norris then added, as "just another thought," that he had a full-service restoration shop and could restore a "road worn" piano.

Gibson's initial references to a BD275 piano and Norris's subsequent email about a road-worn piano refer to two different things, and Foundation's conflation of a Baldwin Dongbei BD275 and the subject piano, which is a model SD-10 from the 1980s, misses the point of Norris's later suggestion.

Second, insofar as Foundation relies on the June 2011 emails between Dorn and Felber as proof of a loan between Gibson and Norris, that reliance is misplaced. Those emails are hearsay and are not reducible to competent evidence where Gibson and Foundation have been unable to produce Dorn or Felber as witnesses. And, even if the emails were admissible as to the conversation between Dorn and Felber, the emails—which were not sent to Norris—do not rebut Norris's claims that Felber told Norris that he could have the piano outright if he moved it from New York City.

Third, Foundation claims that Norris delivered the subject piano to different locations based on Gibson's lease agreements with third parties. But the only evidence Foundation has adduced in support is a loaner agreement for a piano with a different serial number.

Finally, Foundation points to several statements or silences by Norris as proving that Norris knew that he did not legally own the piano: a 2013 news article in which Norris referred to himself as the subject piano's "indefinite custodian"; the lack of any claim of ownership by Norris until after the Piano Mill's roof collapsed; and Norris's request that Gibson auction off the subject piano and donate the proceeds to the Piano Mill's reconstruction. While this evidence as to ownership may have had bearing on a conversion claim had such a claim not been time-barred, and will be relevant to Norris's declaratory judgment claim as discussed below, the evidence is not sufficient to establish an agreement between the parties on the material terms of a contract to warehouse the piano.

Accordingly, where Foundation has not produced sufficient evidence from which a jury could find an agreement on the material terms of a contract, the court grants Norris summary judgment as to Foundation's breach of contract claim.

B.   *Norris's Counterclaims*

1.   Declaratory Judgment[5]

Norris counterclaims for declaratory judgment declaring him the owner of the subject piano. Foundation argues that it is entitled to summary judgment where the undisputed evidence demonstrates that Foundation owns the subject piano.

The evidence as to the ownership of the piano, however, is not undisputed. While Foundation points to Norris's statements and silences between 2013 and 2015 as described above, Norris's testimony that Felber told him in 2011 that he could have the piano outright if he moved it from New York City is unrebutted. Norris also notes that Gibson did not make any claim to the piano for four years until after he provided an estimate of its value to the media in the aftermath of the roof collapse.

In sum, there remains a factual dispute as to Norris's claim of ownership of the piano, which is for a jury, not the court, to decide. Foundation's motion for summary judgment as to this claim is therefore denied.

2.   Abuse of Process

Foundation also seeks summary judgment on Norris's counterclaim for abuse of process. "To succeed on a claim for abuse of process, a moving party must prove that (1) a process was

---

[5] The counterclaim also contains a claim for "equitable relief," but that claim appears to seek identical relief—an order declaring Norris the owner of the subject piano. The court treats both claims as a single claim for declaratory judgment.

16

used (2) for an ulterior or illegitimate purpose (3) resulting in damage." See Millennium Equity Holdings, LLC v. Mahlowitz, 456 Mass. 627, 636, 925 N.E.2d 513 (2010). Ulterior or illegitimate purpose exists where a party "institut[es] a civil action to achieve a collateral purpose other than winning the lawsuit." Am. Mgmt. Servs., Inc. v. George S. May Intern. Co., 933 F.Supp. 64, 69 (D. Mass. 1996). The ulterior motive must be "more than the intent to harass; there must be intention to use process for coercion or harassment to obtain something not properly part of the suit." Broadway Mgmt. Servs. Ltd. v. Cullinet Software, Inc., 652 F.Supp. 1501, 1503 (D. Mass. 1987). For example, Massachusetts courts have found ulterior purpose where a party used process to improperly influence the outcome of a separate, ongoing lawsuit, see, e.g., Am. Velodur Metal, Inc. v. Schinabeck, 20 Mass. App. Ct. 460, 470, 481 N.E.2d 209 (1985); where a company's litigation was intentionally used as a marketing tool against competitor's trade show, see Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 775-76, 489 N.E.2d 185 (1986); where a party filed for attachment to real property to prevent its sale to a third party, see Malone v. Belcher, 216 Mass. 209, 103 N.E. 637 (1913); and where a husband started an action against his wife to coerce a favorable divorce settlement, see American Velodur Metal, Inc. v. Schinabeck, 20 Mass. App. Ct. 460, 481 N.E.2d 209 (1985). Liability for abuse of process will not be based, however, "on the badly motivated use of a procedure that perhaps was burdensome but not improper." Simon v. Navon, 71 F.3d 9, 17 (1st Cir. 1995).

Norris's counterclaim is based on the allegation that Foundation intentionally filed its lawsuit in a venue—the Middle District of Tennessee—where it knew the district court did not have jurisdiction so as to intimidate him and force him to incur attorneys' fees. Norris argues that Gibson's counsel wrote to him in March 2019 after four years of silence threatening to file suit in Massachusetts if he did not return the piano—thereby demonstrating an understanding of where

17

venue was proper—but then filed suit in Tennessee. Norris claims that this was "clearly" a strategic decision designed to exert unfair pressure on Norris, to achieve an unfair advantage, and to force Norris to incur significant costs and expense to have the case transferred to Massachusetts. Even assuming that Norris had proven these allegations, they do not amount to an abuse of process claim where Norris has not shown that Foundation was seeking an outcome other than prevailing on its substantive claims. Summary judgment in favor of Foundation is therefore granted.[6]

### V.     Conclusion

For the foregoing reasons, Norris's Motion for Summary Judgment [Doc. No. 99] is GRANTED. Foundation's Motion for Summary Judgment [Doc. No. 101] is GRANTED IN PART as to Count III (abuse of process) of Norris's counterclaim and is otherwise DENIED.

IT IS SO ORDERED.

May 25, 2022                                                                /s/ Indira Talwani
                                                                                      United States District Judge

---

[6] The court notes that the proper remedy for harassing conduct during otherwise legitimate litigation would have been to serve (and, if necessary, file) a Rule 11 motion.